NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia


Decided: February 17, 2026


S26A0194. BRADFORD v. THE STATE.

PETERSON, Chief Justice.

Xavier Bradford appeals his convictions for felony murder and

other crimes related to the shooting death of Keneisha Carr.[1]

---

[1] Keneisha died on January 14, 2011. In April 2011, a Fulton County grand jury returned an indictment against Bradford, Prinston Blackwell, and Kerwin Tate. Bradford was charged with violation of the Street Gang Terrorism and Prevention Act (Count 1), malice murder (Count 2), felony murder (Counts 3 and 4), aggravated assault against Keneisha (Count 5), aggravated assault against Derrick Carr (Count 6), aggravated assault against Brandon Swann (Count 7), attempted armed robbery (Count 8), and possession of a firearm during the commission of a felony (Counts 9, 10, and 11). Bradford was tried alone in August 2012, and at that trial, he was found not guilty on Count 2 and guilty on all remaining counts. Bradford was sentenced to serve life in prison on Count 3, a 15-year prison term on Count 1 to run consecutively to Count 3, 20-year prison terms on Counts 6 and 7 to run consecutively to Count 3 and to each other, a 10-year prison term on Count 8 to run consecutively to Count 7, and five-year prison terms for Counts 9, 10, and 11 to run consecutively to Count 8 and to each other. The remaining counts were merged or vacated by operation of law. See *Leeks v. State,* 296 Ga. 515, 524 (2015).

Bradford, through counsel (Dolly M. Fairclough), timely filed a motion for new trial in August 2012, but it took 13 years for the trial court to rule on

that motion. No order allowing counsel to withdraw is in the record. Bradford filed several pro se pleadings over the years, making repeated requests for trial transcripts to pursue habeas corpus relief, noting at several points that he was indigent and that his trial counsel had not provided them to him. The trial court (Judge T. Jackson Bedford, Jr.) denied these requests because Bradford had not made a showing of necessity, erroneously believing that the time for a direct appeal had lapsed and that there was no pending post-conviction motion. The trial court (Judge John J. Goger) denied another request for transcripts because Bradford failed to submit an affidavit of indigency or show that his attorney was not supplied a copy of the transcripts. Bradford made additional requests for the records and for appointed counsel, and new counsel (Cynthia Wright Harrison) made an appearance in August 2016. Appellate counsel then filed a motion for transcripts in March 2018, stating that the court reporter (Cheryl D. Gilliam) failed to meet several deadlines to deliver them. The transcripts appear to have been filed sometime in 2018, but multiple different counsel (Kenneth W. Sheppard, Lucile M. Ruiz, Dillon P. McConnell, and Elizabeth A. Geoffroy) began representing Bradford thereafter; new counsel amended the motion for new trial but mostly filed motions to continue and notices of leaves of absence. To its credit, the State (represented by Kevin Armstrong and then Virginia L. Davis) filed motions for status conferences in 2017 and 2022, noting the significant delay in post-conviction proceedings and that no amended motion for new trial had been filed. Thereafter, in July 2023, appellate counsel filed an amended motion for new trial, raising for the first time an allegation of ineffective assistance of trial counsel. The court finally held a hearing in April 2025 and denied Bradford's motion for new trial later that month. Bradford timely appealed, and his appeal was docketed to this Court's term beginning in December 2025 and submitted for a decision on the briefs.

This inordinate delay was unacceptable. We regrettably find it necessary to say, yet again, that "it is the duty of all those involved in the criminal justice system, including trial courts and prosecutors as well as defense counsel and defendants, to ensure that the appropriate post-conviction motions are filed, litigated, and decided without unnecessary delay." *Owens v. State*, 303 Ga. 254, 259 (2018). Although we note that some of the delay was caused by delays in having transcripts prepared, even when the transcripts were completed in 2018, it took another five years for Bradford's attorneys to review them before filing an amended motion for new trial. Although a complete record is necessary to pursue a direct appeal, the rest of the delay (another seven years) seems to have been caused at least in part by our precedent that ineffectiveness

Bradford argues that the evidence was insufficient to convict him; the trial court made a number of evidentiary errors; he received ineffective assistance of counsel; and the combined prejudice from the trial court's errors and trial counsel's ineffectiveness warranted a new trial. As explained below, none of these claims have merit, so we affirm.

1. *The trial evidence*

Viewed in the light most favorable to the verdicts, the trial evidence showed the following. Bradford was a member of Red Kartel, a criminal street gang, had "Kartel" tattooed on his face, and appeared in a rap video in which he wore a sweatshirt with "Kartel Shooter" printed on the back. The individuals in that rap video, including Bradford, had red bandanas, which indicated their Blood

claims of trial counsel need to be raised on direct appeal, which requires a hearing to develop the factual record and trial counsel to be replaced by another counsel purely to allow the defendant to pursue these possible claims. See *Schoicket v. State*, 312 Ga. 825, 830 & n.6 (2021) (describing "tangle[d]" and "confusing" post-conviction procedure that has largely developed as a result of our precedent requiring Sixth Amendment claims of ineffective assistance of counsel to be raised on direct appeal); *Hightower v. State*, 287 Ga. 586, 593 (2010) (a defendant cannot raise an ineffectiveness claim on appeal where he continues to be represented by trial counsel).

3

gang membership; used the phrase "Soowoo," which was a common greeting to other Blood members; and flashed Blood gang hand signs. Red Kartel members also had tattoos with the letters "NFL," which stood for "Never Forget Loyalty." Jessica Corley, whose former husband was the leader of Red Kartel, testified that she was a member of the gang, had an "NFL" tattoo on the side of her ear, and was told that the location of the tattoo would be "where the bullet [would] go" if she betrayed the gang. Corley also testified that Bradford was associated with the gang, that the gang sold drugs and committed armed robberies, and that members earned their "flag," or bandana representing their membership in the gang, by robbing someone, committing another crime that provided money for the gang, or shooting someone. Corley also testified that when funds were low, her former husband would direct members to commit crimes to bring in money, and that any time a member of the gang committed a crime that earned money, a portion of it had to be paid to the gang, akin to paying dues.

A criminal street gang expert testified that Red Kartel

originally started as a rap group but became a gang affiliated with the Bloods gang, and the group's criminal activities were primarily drug sales and armed robberies. He testified that money is a big part of the gang life, helping the gang maintain structure and order, and that members are expected to participate in criminal activity to earn revenue or income in order to "contribute to the overall increase of the gang." The expert also testified that a gang member has to "put in work," or perform criminal activities for the gang, in order to gain respect and standing, and those who gain the most respect are those who are willing to commit violent acts. He also testified that respect is a foundational principle of a gang, allowing the gang to "build a kind of island of safety" to prevent challenges by other people and to "protect their financial gain."

On January 14, 2011, Brandon Swann was returning to his grandmother's apartment in Fulton County after cashing a check. Swann had a couple of hundred dollars in cash. Swann stopped by a Stop and Shop to buy a drink for his friend Keneisha, and then walked back to Swann's grandmother's apartment, where he was

staying. As he approached the apartment, two men with guns approached him, telling him to "[g]ive it up." Swann responded that he did not have anything and began yelling for help from Derrick Carr, who also lived at the apartment with Keneisha. When Derrick opened the apartment door, Swann moved toward the apartment, at which point one of the men began to pistol-whip Swann, told Derrick to "back the f**k up," and fired a shot. Derrick testified that the other "guy" had "covered up his face." Derrick told his wife to get down because "they" were about to "start shooting in the house." Swann ran inside the apartment and gunshots rang out. Swann and Keneisha were struck, and Keneisha died from a gunshot wound. Swann was shown a photo lineup and made a positive identification of the person who pistol-whipped him, but Swann was not asked to make an in-court identification.

Tabatha Martin also lived at the apartment with the Carrs and Swann, and she testified that she went to a window when she heard Swann screaming outside the apartment. She saw one male pointing a gun towards the door and another male with a black hoodie further

6

away who was "trying to cover his face." Martin could not hear what was going on through the window but heard the shooting.

One neighbor, Wendell Harrell, described seeing the two males following Swann. Harrell said that one of the males was "tall" and was wearing a black shirt and a black hoodie. Harrell also said that "that one there," apparently referring to Bradford,[2] had "little dreads in his head" and had a big tattoo on his face that looked like a crown. Harrell was washing his car when the men walked past him and believed the two males were "up to something" as they followed the "short guy" (Swann). After the three males turned the corner, Harrell heard "Hey, man, y'all stop. Man, don't hurt me. Don't kill me. … I ain't got no money." Harrell looked around the building and told the males to leave the "short guy" alone, at which point the male with the tattoo fired a shot at Harrell. Harrell took cover and then heard "some lady" cursing and attempting to defend the "little short guy." Harrell heard one gunshot before the door

---

[2] The record does not reflect a clear in-court identification of Bradford, but he was the only defendant on trial.

slammed. Harrell then saw the taller male take the gun from the other male and fire into the apartment through the door and window. Harrell confirmed that the "guy" with the tattoo on his face was the person who pistol-whipped the "little short guy" and fired a shot at Harrell.

Detective Scott Demeester found six .380-caliber shell casings at the crime scene, and a ballistics expert determined that all of the recovered casings were fired from the same gun. Swann told Detective Demeester that he believed one of the suspects who shot him had been at the Stop and Shop while Swann was there. Detective Demeester secured surveillance footage from the Stop and Shop and interviewed Sheldon Brown, who had been identified in that video and was known as "Poopydoo." Based on his investigation, including an interview with Brown, Detective Demeester arrested Prinston Blackwell, who went by "Tank," and Kerwin Tate, who went by "Elmo."

Blackwell was interviewed after waiving his *Miranda*[3] rights

---

[3] *Miranda v. Arizona*, 384 US 436 (1966).

and later charged along with Bradford and Tate. Blackwell testified at Bradford's trial as part of his plea deal, stating that he was a member of Red Kartel, had "NFL" tattooed on his right cheek, and had pleaded guilty to murder in this case and agreed to testify against Bradford. Blackwell testified that he had previously reported that Bradford and Tate were with him at the time of the murder. After testifying that he and Bradford were childhood friends and being asked whether Bradford had an "NFL" tattoo on his face, Blackwell's testimony was paused and resumed the next day.[4] When Blackwell was recalled, he was treated as a hostile witness,[5] and he generally testified that he did not remember giving any information implicating Bradford to Detective Demeester or to the prosecutor. The State ended its questioning when Blackwell said that he did not want to testify.

Detective Demeester testified after Blackwell and gave an

---

[4] The bench conference on the matter was not transcribed, but it appears that the State had asked for Blackwell's testimony to be postponed.

[5] Prior to being recalled, Blackwell filed a motion to withdraw his guilty plea.

account of Blackwell's custodial interview in which he described committing the shooting with "Shooter" and "Elmo," which were Bradford's and Tate's nicknames respectively.[6] The trial court ultimately struck Detective Demeester's testimony regarding Blackwell's custodial interview and instructed the jury to disregard it.[7]

Detective Demeester also testified that he seized Blackwell's and Tate's cell phones during their arrests. Detective Demeester looked through Tate's contacts on his phone, and he found a number (the "target number") associated with "Fish." Bradford was known

---

[6] In his custodial interview, Blackwell said that on the day of Keneisha's murder, he received a call from Poopydoo, later identified as Brown, who said there was a "guy in the [Stop and Shop] with a lot of money." Based on Poopydoo's instructions, Elmo drove Blackwell and Shooter to an apartment complex, where Shooter approached the victim, demanded the victim's personal belongings, and began to pistol-whip the victim when the victim resisted. Blackwell said that Shooter, carrying a .380-caliber handgun, began firing into an apartment whose door had been opened. Blackwell and Shooter fled, got back into Elmo's car, and they all left the area together.

[7] Although Bradford did not initially object to Detective Demeester's testimony about Blackwell's custodial interview, he objected on Confrontation Clause grounds when the State attempted to admit a recording of that interview. The trial court sustained that objection and later struck Detective Demeester's testimony about Blackwell's custodial interview.

10

to go by the name "Fish," as well as "Shooter." During Bradford's custodial interview, he did not deny using that number and stated that no one else other than his girlfriend used his phone. During his custodial interview, Bradford stated that he was at his father's house on the day of the shooting and that he never left the house. Bradford admitted that he knew Blackwell and Tate but stated that he did not know them "that well."

Cell site records indicated that the phone with the target number, along with numbers connected to Blackwell and Tate, all pinged off a tower within one mile of the murder scene at the time of the shooting and all pinged off the same cell towers immediately after the shooting. The subscriber name for the target number was "Kartel Shooter."

Cell phone records showed that the target number sent a text message on January 21, 2011, saying, "Da police got Tank n Elmo. A lot of shyt." Blackwell (Tank) and Tate (Elmo) were both arrested on January 21. The next day the target number sent a text message to someone to "Take dat shyt str8 hme n pt it up. Dnt neva bring it

11

out till I say so." In explaining the context of this message, Detective Demeester testified that the murder weapon was never found. Text messages and cell phone calls ceased from the target number on January 22, 2011, and a new phone number was activated that had the same subscriber name (Kartel Shooter) and same address associated with the target number. On January 22, a text was sent from that new number saying, "Fish new num." In response to a text question about why the subscriber changed his number, the subscriber said, "alot going...wit da police n shyt. Alot of shit." The subscriber also mentioned Tank and Elmo going to court, and Bradford's girlfriend told the subscriber, "dont tell nobody where you at and dont talk on the phone cuz that's how they got [someone else] so just text and erase em." When the subscriber responded that he had changed his number, Bradford's girlfriend responded that "they" could still "find that out" based on getting "your old number." Also on January 22, someone texted the new number, saying that "Tank said to get rid of that," to which the subscriber responded, "Dat ben gne last nite." The following day, in a text exchange,

12

someone asked the subscriber, "Bra is that gun hot[?]," and the new subscriber responded, "Hell yea[.]"Detective Demeester explained that a "hot" gun was either stolen or used in a murder. In a subsequent message sent to the new number, the messenger used Bradford's first name, Xavier, stating, "I hear ya, Xavier."

At trial, Bradford asserted an alibi defense, presenting evidence that he was home at the time of the murder.

2. *The evidence was sufficient.*

Bradford argues on appeal that the evidence was insufficient as a matter of constitutional due process to support his convictions. Bradford argues that the State's case relied primarily on the hearsay testimony of co-indictee Blackwell and circumstantial evidence in the form of cell phone records and related hearsay evidence. Bradford argues that this hearsay evidence could not support a conviction because it had no probative value under the version of the Evidence Code that governed his trial[8] and that it also did not

---

[8] Because Bradford was tried in 2012, his case is controlled by the old Evidence Code.

exclude every reasonable theory of innocence at trial. He also argues that with respect to his criminal street gang conviction, the State failed to prove a nexus between the predicate acts and an intent to further the interests of the gang. We disagree.

In considering a claim that evidence was not sufficient as a matter of federal constitutional due process under *Jackson*,[9] "our review is limited to an evaluation of whether the trial evidence, when viewed in the light most favorable to the verdicts, is sufficient to authorize a rational trier of fact to find the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." *Goodman v. State*, 313 Ga. 762, 766 (2022) (quotation marks omitted). "We put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." Id. at 766–67 (quotation marks omitted). In determining the sufficiency of the evidence, we consider all of the evidence admitted by the trial court, even erroneously admitted evidence. *Bradshaw v. State*, 296

---

[9] *Jackson v. Virginia*, 443 US 307 (1979).

Ga. 650, 653 (2015). But in a sufficiency analysis for cases tried under the pre-2013 Evidence Code, which applied to this trial, we do not consider improperly admitted hearsay evidence, which was considered to have no probative value. Id. at 653 n.2.

(a) *The trial evidence that we can consider on sufficiency review.*

Before engaging in our sufficiency analysis, we must address Bradford's argument that much of the evidence pointing to his guilt was hearsay evidence that had no probative value. His hearsay arguments lack merit.

With respect to the cell phone evidence, a Metro PCS records custodian testified that the cell phone records in this case, including text messages and cell site tower information, were kept in the ordinary course of business, describing how those records were created and that, unless there was a legal request for the records, the records were purged within six months. Given this testimony, Bradford has failed to show that a proper foundation was lacking to preclude the admission of the cell phone records as business records as an exception to the hearsay rule under former OCGA § 24-3-14.

15

See, e.g., *Blackledge v. State*, 299 Ga. 385, 391 (2016) (cell phone records custodian testified that records were made in the regular course of business at or near the time that the phone calls were made and the cell towers detected the presence of the phones); *Kilgore v. State*, 295 Ga. 729, 730–32 (2014) (because the appellant failed to show that "foundational" element was missing, cell phone records were admissible as business records based on testimony from records custodian that cell phone records were kept in ordinary course of business).

Bradford also argues that Detective Demeester's testimony that two cell phone numbers associated with subscriber "Kartel Shooter" belonged to Bradford was based on hearsay, because it was based on Metro PCS records and a statement from Tate.[10] We have already concluded that the Metro PCS records qualified as business

---

[10] We had held that, under the old Evidence Code, unless it was the rare case in which the conduct of an investigating officer was a matter needing to be explained, it was error to permit an investigating officer to testify, under the guise of explaining the officer's conduct, to what other persons said to the officer during the investigation. See, e.g., *Weems v. State*, 269 Ga. 577, 579 (1998).

records and thus did not constitute hearsay. And contrary to Bradford's argument, Detective Demeester did not obtain the initial target phone number for Bradford based on any statement from Tate. Detective Demeester testified that he obtained the phone number by accessing Tate's cell phone and found the number under the contact for "Fish," which was one of Bradford's nicknames. This number was confirmed by the Metro PCS records custodian as having a subscriber account named "Kartel Shooter." Thus, the evidence linking the "Kartel Shooter" cell phone numbers to Bradford was not based on hearsay, and Bradford's argument therefore fails.

Bradford also argues that the custodial statements of co-indictee Blackwell, which were introduced through the testimony of Detective Demeester, were hearsay. We need not resolve this question, however, because that evidence was ultimately stricken from the jury's consideration and, thus, is not a part of our

sufficiency review.[11]

(b) *The evidence was sufficient to establish Bradford's involvement in the crimes.*

Discounting Blackwell's custodial statements (because they were stricken), the evidence before the jury was sufficient to establish Bradford's involvement in the crimes for which he was convicted. We first consider whether the evidence was sufficient to show Bradford's involvement in the crimes as a general matter, and then analyze separately his argument that the evidence was insufficient to show a violation of the Street Gang Act.

In Blackwell's limited testimony that was responsive to the State's questions, he specifically testified that he had pleaded guilty to the crimes in this case, and that he told the prosecutor previously that Bradford and Tate were with him at the time of the murder.

---

[11] The trial court struck Blackwell's custodial statements under the Confrontation Clause of the Sixth Amendment to the United States Constitution, despite the fact that Blackwell testified and Bradford was able to cross-examine him. But see *Burney v. State*, 309 Ga. 273, 282–83 (2020) (the Sixth Amendment's right of confrontation provides defendants with "the right physically to face those who testify against him, and the right to conduct cross-examination.").

18

Because Blackwell was an eyewitness by virtue of his own participation in the crimes, his testimony constituted direct evidence, so the circumstantial evidence statute (former OCGA § 24-4-6) does not apply in our sufficiency analysis. See *Bradley v. State*, 318 Ga. 142, 144 (2024) ("And if there is any direct evidence presented by the State, the circumstantial evidence statute does not apply in a sufficiency analysis." (quotation marks omitted)).[12]

Additional independent evidence implicated Bradford.[13] Several eyewitnesses, including Swann, testified about their

---

[12] In his appellate brief, Bradford makes passing references to the circumstantial evidence in this case, but he does not cite former OCGA § 24-4-6, or its successor in the current Evidence Code, OCGA § 24-14-6, which provides that where a conviction is based on circumstantial evidence, "the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused[.]" To the extent he tries to raise a claim under former OCGA § 24-4-6, it also fails. See *Blevins v. State*, 291 Ga. 814, 816 (2012) (whether an alternative hypothesis was a reasonable one under former OCGA § 24-4-6 was principally a question for the jury).

[13] In challenging the sufficiency of the evidence, Bradford makes no argument that Blackwell's testimony needed to be corroborated. See *Crawford v. State*, 294 Ga. 898, 900–01 (2014) (under former OCGA § 24-4-8 (now OCGA § 24-14-8), in felony cases where the only witness implicating the defendant is an accomplice, the accomplice's testimony must be supported by independent corroborating evidence that "either directly connect[s] the defendant with the crime or justif[ies] an inference that he is guilty.").

19

observations of events leading to the attempted armed robbery and Keneisha's death. That eyewitness testimony established that two males followed Swann; one man pulled a gun on him, pistol-whipped him, demanded money from him; and one of the men fired shots into the apartment that killed Keneisha. Although Swann and Derrick did not make a positive in-court identification of the assailants, Harrell also witnessed the shooting and testified that "that one there," apparently referring to Bradford (the only defendant on trial), was the person who pistol-whipped Swann, while the other assailant was "covering his face," which was consistent with Martin's and Derrick's testimonies that one assailant pointed a gun while the other was trying to "cover his face."[14] No doubt, Harrell's description of Bradford as "that one there" was not a crystal-clear identification, but his testimony corroborated Blackwell's testimony.

---

[14] Harrell also said that "that one there" had a tattoo on his face that looked like a "crown or something." Detective Demeester testified that Bradford had a tattoo of "NFL" on his face but did not mention whether it was in the shape of a crown. Blackwell said he had a crown tattoo on his face. To the extent there was some conflict in the evidence, that was for the jury to resolve. See *Goodman*, 313 Ga. at 766–67.

Regardless of which of the two males actually shot into the apartment, the evidence recounted above nevertheless established Bradford's participation in the crimes, at least as a party to a crime. See *McIntyre v. State*, 312 Ga. 531, 534–35 (2021) (a shooting is a reasonably foreseeable consequence of an armed robbery and the jury was authorized to find defendants guilty of conspiracy to commit armed robbery and felony murder where they agreed to commit an armed robbery, took a substantial step toward committing that offense and an overt act in furtherance of the conspiracy, and caused a death in the process). See also OCGA § 16-2-20(b)(1)–(4) (a defendant may be found guilty of a crime if he directly committed it or was a "party thereto," meaning he meaning he "cause[d]" another person to commit the crime, "aid[ed] or abet[ted]" its commission, or "[i]ntentionally advise[d], encourage[d], hire[d], counsel[ed], or procure[d] another to commit the crime").

In addition to the eyewitness testimony, the cell phone evidence corroborated Blackwell's testimony that Bradford was

21

present and provided proof of Bradford's shared criminal intent. *See*

*Glenn v. State*, 306 Ga. 550, 553 (2019) (proof of shared criminal intent may be inferred from the defendant's presence, companionship, and conduct with another perpetrator before, during, and after the crimes). Cell site evidence showed that a phone belonging to Bradford was in the area of the crime during the time of the attempted robbery and shooting of Keneisha and that it traveled with phones associated with Tate and Blackwell before and after the crime. The cell phone records also showed that after Tate's and Blackwell's arrests, Bradford changed his phone number, explaining in text messages that he did so because there was "alot going…wit da police n shyt. Alot of shit." And despite telling Detective Demeester that he did not know Blackwell and Tate very well, Bradford sent and received numerous text messages after the crime that showed an interest in Blackwell's and Tate's arrests and scheduled court appearances and that reflected his efforts to help Blackwell hide or destroy evidence, as he confirmed that he got "rid of that," as Blackwell wanted. Although the "that" in the text

22

message was not clear, the jury could infer that this referred to the murder weapon, as Bradford confirmed in a subsequent text message that the gun was "hot," which Detective Demeester explained referred to the gun being used in a crime. Lastly, in several text exchanges between Bradford and his girlfriend after Blackwell's and Tates's arrests, there was discussion about Bradford not telling anyone where he was and avoiding talking on the phone in order to avoid police detection. All of these text messages provided circumstantial evidence of guilt. See, e.g., *Adams v. State*, 318 Ga. 105, 112 (2024) (attempt to hide from or elude police constitutes circumstantial evidence of consciousness of guilt); *Morrell v. State*, 313 Ga. 247, 256 (2022) ("Georgia law has long recognized that evidence that a defendant attempted to obstruct justice … can serve as circumstantial evidence of guilt."); *State v. Orr*, 305 Ga. 729, 741 (2019) (concealment is evidence of consciousness of guilt). Considering all of the evidence recounted above, that evidence was sufficient as a matter of constitutional due process to establish Bradford's participation in the crimes.

(c) *The evidence was sufficient to support a violation of the Street Gang Act.*

Bradford argues that the evidence was insufficient to support his Street Gang Act conviction because the State did not establish a nexus between the predicate acts (such as felony murder, attempted armed robbery) and an intent to further the gang's interests. We disagree.

The Street Gang Act makes it "unlawful for any person … associated with a criminal street gang to … participate in criminal gang activity through the commission of" certain enumerated offenses. OCGA § 16-15-4(a). To establish a violation of the Street Gang Act, the State is required to prove four elements:

> (1) the existence of a "criminal street gang," defined in OCGA § 16-15-3(3) as "any organization, association, or group of three or more persons associated in fact, whether formal or informal, which engages in criminal gang activity"; (2) the defendant's association with the gang; (3) that the defendant committed any of several enumerated criminal offenses, including those "involving violence, possession of a weapon, or use of a weapon"; and (4) that the crime was intended to further the interests of the gang.

*Rooks v. State*, 317 Ga. 743, 753 (2023) (cleaned up).

24

Bradford only challenges the sufficiency of the evidence as to the fourth element, so we limit our analysis to that element. See *Blocker v. State*, 316 Ga. 568, 575–76 (2023) (in sufficiency review, considering only elements of Street Gang Act challenged by the appellant). This fourth element requires some nexus between the act and the intent to further street gang activity. *Rodriguez v. State*, 284 Ga. 803, 807 (2009). The State may meet this requirement in a number of ways. For example, evidence of a defendant's association with a gang and participation in its activities before and during the crimes charged may "provide the required nexus between his criminal acts and the intent to further the gang's interests." *Hayes v. State*, 298 Ga. 339, 342–43 (2016). See also *Rodriguez*, 284 Ga. at 807 ("Management of or participation with others in … criminal street gang activity necessarily implies knowledge of the gang's criminal activities and a specific intent to further its criminal purposes."). In addition, evidence that a gang commits certain crimes in order to finance the gang could establish such a nexus. See *Stripling v. State*, 304 Ga. 131, 134 (2018). Further, discussions

25

between fellow gang members after the charged crimes, including about attempts to avoid getting caught, may provide proof of a nexus between the crimes and the gang's interests. See *Boyd v. State*, 306 Ga. 204, 211–12 (2019).

Here, the evidence described above showed that Red Kartel was engaged in criminal activities primarily centered on selling drugs and committing armed robberies. Detective Demeester testified that the gang members were expected to participate in criminal activity in order to earn revenue that would help the gang's interests. Likewise, Corley testified that Red Kartel gang members committed crimes, including armed robberies, to benefit the gang by paying a portion of the proceeds to the gang leader.[15] The evidence

---

[15] As part of his sufficiency argument, Bradford complains about aspects of Corley's testimony in which she described an armed robbery she participated in with fellow Red Kartel members. Bradford argues that this testimony was improperly admitted because this Court ruled in *State v. Jefferson*, 302 Ga. 435 (2017), that OCGA § 16-15-9 violated a defendant's confrontation right by allowing for the admission of "the convictions of non-testifying non-parties as evidence of a criminal street gang." *Jefferson*, 302 Ga. at 443. Bradford makes no independent claim about the admissibility of this testimony, and as we have said before, in considering sufficiency under the old Evidence Code, we consider all the evidence, even improperly admitted evidence (except for hearsay evidence), in evaluating sufficiency. Moreover, *Jefferson* would not seem to

was therefore sufficient as a matter of federal constitutional due process to allow the jury to conclude that Bradford had the intent here to commit the armed robbery in order to further the interests of Red Kartel. See *Butler v. State*, 310 Ga. 892, 897–98 (2021) (nexus established when the gang used prostitution and robbery of "johns" to finance the gang and the shootings resulted from that sort of activity).

In sum, the evidence was sufficient to authorize the jury to find Bradford guilty of all the crimes for which he was convicted.

3. *Many of Bradford's challenges to parts of Detective Demeester's testimony were not preserved for review.*

Bradford argues that the trial court erred in allowing Detective Demeester to testify that two cell phone numbers belonged to Bradford because that testimony was based on hearsay evidence. We briefly considered the extent to which this testimony was based on hearsay evidence above in setting out what evidence we could review in our sufficiency analysis. We need not consider the hearsay

apply in this case, because *Jefferson* involved "non-testifying non-parties," whereas Corley did testify and was subject to cross-examination.

27

challenge further because Bradford did not object to this testimony on hearsay grounds, meaning that this claim was not preserved for appellate review under the old Evidence Code. See *Eleby v. State*, 319 Ga. 234, 247 (2024) (under the former Evidence Code, the failure to object to testimony precluded appellate review, and there was no plain error review available).

Similarly, we need not consider Bradford's arguments regarding Detective Demeester's testimony about Blackwell's custodial statements. Even if Bradford objected to this testimony initially, which he did not, the trial court ultimately struck this testimony, so the issue was mooted.

4. *Bradford has failed to show that the trial court abused its discretion in admitting the rap video on the basis that it was more unduly prejudicial than probative of Bradford's association with a criminal street gang.*

In this claim, Bradford provides a recitation of the discussion surrounding the admission of the rap video evidence, including his objection on relevance and undue prejudice grounds. But he makes no argument in his brief as to why the evidence was prejudicial,

much less unduly prejudicial. See *Miller v. State*, 277 Ga. 707, 709 (2004) (under the former Evidence Code, relevant evidence could be excluded if its probative value was substantially outweighed by the danger of undue prejudice). Therefore, Bradford has failed to carry his burden of showing error. See *Henderson v. State*, 251 Ga. 398, 402 (1983) ("[T]he burden is on the appellant to show, from the record, that error occurred.").

5. *Bradford failed to preserve the argument that the trial court abused its discretion in admitting recordings of his jail phone calls.*

Bradford argues that the trial court abused its discretion in admitting State's Exhibit 125, recordings of Bradford's jail phone calls, because the recordings were irrelevant and their prejudicial effect outweighed any probative value. Bradford also argues that the State failed to lay a foundation for Detective Demeester to identify the voices on one recording as belonging to Bradford and Jermicka Wyatt, his girlfriend. Bradford has not preserved these arguments for appellate review.

When the State moved to admit the exhibit containing the

29

recordings, Bradford made no objection. Nor did Bradford object when Detective Demeester testified that he could recognize the voice of Bradford and Wyatt on the recorded calls. Because Bradford made no objections on the grounds he raises on appeal, he failed to preserve these arguments for appellate review, and plain error review is unavailable under the old Evidence Code. See *Eleby*, 319 Ga. at 247.

6.    *Bradford has not established that trial counsel provided ineffective assistance.*

Bradford argues that trial counsel was ineffective on several grounds. None of his claims have merit.

To prevail on his ineffectiveness claim, Bradford must show that (1) his trial counsel's performance was constitutionally deficient and (2) he was prejudiced by counsel's deficient performance. See *Strickland v. Washington*, 466 US 668, 687 (1984). If Bradford fails to establish one of these two prongs, "we need not examine the other." *Robinson v. State*, 308 Ga. 543, 553 (2020). To show deficient performance, the defendant must demonstrate that counsel

30

performed counsel's duties in an objectively unreasonable way, considering all of the circumstances and in the light of prevailing professional norms. See *Strickland*, 466 US at 687–88. In evaluating alleged deficiency, we afford a "strong presumption that counsel's performance fell within a wide range of reasonable professional conduct, and that counsel's decisions were made in the exercise of reasonable professional judgment." *Wright v. State*, 314 Ga. 355, 357 (2022) (quotation marks omitted). And "decisions about trial tactics and strategy in particular may not form the basis of an ineffectiveness claim unless they were so patently unreasonable that no competent attorney would have followed such a course." *Warren v. State*, 314 Ga. 598, 602 (2022) (quotation marks omitted).

To establish prejudice, Bradford "must show that there is a reasonable probability that, but for counsel's unprofessional error[], the result of the proceeding would have been different." *Strickland*, 466 US at 694. "In reviewing a ruling on a claim of ineffective assistance of counsel, we defer to the trial court's findings of fact unless they are clearly erroneous, but we apply the law to the facts

31

de novo." *State v. Spratlin*, 305 Ga. 585, 591 (2019).

(a) *Trial counsel was not deficient for failing to seek suppression of text messages to and from Bradford's phone.*

Bradford argues that trial counsel was ineffective for failing to move to suppress the text messages to and from his phone because, although the State secured a court order to obtain those text messages from Metro PCS, there is no indication that a proper petition with the required showing of probable cause had been filed. We disagree.

Because Bradford claims that trial counsel was ineffective for failing to file a motion to suppress, he has the burden "to make a strong showing that the damaging evidence would have been suppressed had counsel made the motion." *Smith v. State*, 296 Ga. 731, 733 (2015). To make this showing, he has to establish that the motion to suppress would "clearly have succeeded" on the ground alleged had his trial counsel raised it. *Ward v. State*, 313 Ga. 265, 275 (2022). He has failed to carry that burden.

Bradford argues that the State did not comply with the Stored

Communications Act, 18 USC § 2703(a), which requires a warrant to obtain the disclosure of cell phone messages pursuant to that provision, or the complementary provision under the Georgia Code, OCGA § 16-11-66.1(a). At the motion for new trial hearing, Bradford noted that the motions supporting the request for the cell phone records were not in the record or made available to the defense and argued that without these motions it was not clear whether the State followed the correct procedure or had a sufficient justification for the records, so trial counsel should have filed a motion to suppress to "hash that out."

Bradford's claim fails. Shortly after Bradford's trial in August 2012, we held, as a matter of first impression, that defendants generally had no reasonable expectation of privacy in their cell phone records and therefore lacked standing to raise a Fourth Amendment challenge to the disclosure of the records and that the suppression of evidence was not an available remedy under the Stored Communications Act or OCGA § 16-11-66.1(a). See *Registe v. State*, 292 Ga. 154, 156–57 (2012), overruled by *Carpenter v. United*

33

*States*, 585 US 296 (2018). Although this precedent no longer applies, at least with respect to standing, see *Outlaw v. State*, 311 Ga. 396, 401 (2021), had trial counsel raised a challenge to the cell phone records at the time of trial, it likely would have been rejected. Counsel cannot be said to be deficient for having failed to advance a legal theory that would have required an extension of existing precedents or the adoption of an unproven theory of law. See *Esprit v. State*, 305 Ga. 429, 438 (2019). Therefore, this ineffectiveness claim fails.

(b)  *Trial counsel was not deficient for failing to object to treating Blackwell as a hostile witness or take other corrective action.*

As indicated above, the parties agreed to pause Blackwell's testimony. When he was called the next day, the prosecutor informed the court that Blackwell, through his attorney (who was in the courtroom), had just filed a motion to withdraw his guilty plea. The court declined to take the matter up in the middle of Bradford's trial, but allowed the State to treat Blackwell as a hostile witness on account of his motion. The prosecutor asked a series of questions

34

about Blackwell's arrest and guilty plea, but when the prosecutor began asking him about his custodial statement, Blackwell's attorney objected and said that Blackwell was "reinvoking his Fifth Amendment right to not incriminate himself" by virtue of having just filed a motion to withdraw his guilty plea. The prosecutor responded that Blackwell had waived this right at his plea hearing and had already testified, and that his attorney could not invoke Blackwell's Fifth Amendment rights for him. The court agreed and allowed the prosecutor to ask leading questions about Blackwell's custodial statements that implicated Bradford. During questioning by the State, Blackwell denied making the statements or said that he did not remember giving information that implicated Bradford. When the State pointed out that Blackwell had agreed to cooperate with the State, Blackwell responded that it was not his choice, suggesting that it was his prior counsel's decision. Blackwell's attorney then objected to the State's questioning, and although overruled by the court, the State ended its direct examination when Blackwell said that he did not want to talk. During cross-

examination, Bradford asked Blackwell only one question about whether his custodial statements were voluntarily given, and Blackwell responded that they were not.

Bradford argues that trial counsel should have objected to the State asking leading questions about the contents of Blackwell's custodial statements. But Blackwell's counsel objected to these questions on the same basis Bradford says counsel should have — that Blackwell was asserting his Fifth Amendment rights — and the trial court implicitly overruled this objection. Bradford does not argue, much less show, that a similar objection from his counsel would have been meritorious given the trial court's prior ruling. Thus, he has not shown that trial counsel's failure to object was objectively unreasonable and thus has failed to show that counsel performed deficiently.

(c) *Any failure to object to Detective Demeester's testimony about the contents of Blackwell's custodial statements was not prejudicial.*

Bradford argues that the admission of Blackwell's custodial statements through Detective Demeester's testimony violated his

confrontation rights and that there is a reasonable probability that the jury would have acquitted him if trial counsel had objected to this testimony. We disagree.

As discussed above, although trial counsel did not object to this testimony, the trial court ultimately struck it and instructed the jury to disregard it. We presume that the jury followed the trial court's instruction to disregard that evidence. See *Taylor v. State*, 306 Ga. 277, 282–83 n.17 (2019) ("qualified jurors under oath are presumed to follow the instructions given by the trial court" (quotation marks omitted)). Thus, even if trial counsel was deficient in failing to object to Detective Demeester's testimony,[16] that evidence was not considered by the jury in considering Bradford's guilt. As a result, Bradford cannot show that he would have been acquitted had counsel objected, and this ineffectiveness claim fails.

---

[16] It is doubtful that counsel was deficient for failing to object on this ground, since, as discussed above, Blackwell testified and was subject to cross-examination. Moreover, Blackwell's statements to Detective Demeester were seemingly admissible as a prior inconsistent statement. See *White v. State*, 268 Ga. 28, 33 (1997) (under old Evidence Code, holding that a prior inconsistent statement of a co-conspirator who takes the stand and is subject to cross-examination is admissible as substantive evidence).

37

(d) *Trial counsel was not deficient for failing to object to Detective Demeester's testimony that Bradford was not truthful during his post-arrest interview.*

Bradford argues that trial counsel should have objected when the State asked Detective Demeester to opine on Bradford's demeanor during his custodial interview, running afoul of former OCGA § 24-9-80,[17] which provided that "[t]he credibility of a witness is a matter to be determined by the jury under proper instructions from the court." We disagree that trial counsel was deficient.

In analyzing a similar claim under OCGA § 24-6-620, the successor statute to former OCGA § 24-9-80, we concluded that trial counsel was not deficient in failing to object to statements that purportedly spoke to the credibility of a non-testifying defendant. See *Sawyer v. State*, 308 Ga. 375, 382–83 (2020). We reached this conclusion because past precedent had held that the former statute applied to defendants who testified on their own behalf at trial and so became witnesses; there was no precedent indicating that OCGA

---

[17] This provision was carried forward into the current Evidence Code with minor revisions. See OCGA § 24-6-620.

§ 24-6-620, including precedent on former OCGA § 24-9-80, applied to a defendant who did not testify; and, therefore, trial counsel was not deficient for failing to raise a novel argument. Id. Because the argument Bradford raises was considered novel in 2020 when we decided *Sawyer*, it would have been novel at the time of Bradford's trial, and his claim of deficiency therefore fails.

(e) *Trial counsel was not deficient in failing to object to the prosecutor's statement during closing argument that Blackwell recanted his prior statements and refused to acknowledge them because of Bradford's intimidation.*

In closing argument, the prosecutor suggested that Blackwell recanted because he was afraid of Bradford, arguing that when Blackwell gave implicating information to Detective Demeester, Bradford was not in the room at the time, while Bradford was in the room when Blackwell was testifying. The prosecutor also argued that Blackwell did not follow through with his plea agreement to testify against Bradford because Bradford had a "pack of wolves at his disposal" (i.e., other gang members). In his appellate brief, Bradford argues that because Blackwell denied on direct

39

examination that either Bradford or the Red Kartel had threatened him, the prosecutor's statement amounted to a violation of OCGA § 17-8-75, and trial counsel should have objected. We disagree.

Under OCGA § 17-8-75, when a prosecutor makes "statements of prejudicial matters which are not in evidence, it is the duty of the court to interpose and prevent the same." Although this statute requires that closing arguments be based on the evidence presented at trial, see *Williams v. Harvey*, 311 Ga. 439, 445 (2021), a prosecutor has "wide latitude to argue inferences from the evidence." *Hendrix v. State*, 298 Ga. 60, 66 (2015) (quotation marks omitted).

Bradford has not established that the prosecutor's statement was out of bounds. Although Blackwell testified that no one had threatened him not to testify, that testimony was not conclusive and a jury was entitled to conclude otherwise. See *Alexander v. State*, 118 Ga. 26, 28 (1903) ("What the person himself testifies is not necessarily conclusive, because the jury is authorized to apply the homely maxim that 'actions speak louder than words,' and from one's acts they may determine that the intention was directly

opposite from what he says it was."); see also *Head v. State*, 316 Ga. 406, 412 (2023) ("The jury is also entitled to disbelieve the testimony of a witness or defendant because the jury is the judge of the credibility of witnesses." (cleaned up)). Moreover, trial evidence showed that Red Kartel gang members, including Blackwell, had tattoos with the letters "NFL," which stood for "Never Forget Loyalty," and that the gang would retaliate by killing a member who betrayed the gang. Based on the evidence presented, the State's argument was within the wide range of acceptable closing argument, and counsel's failure to object to it did not constitute deficient performance. See *Hendrix*, 298 Ga. at 66 (trial counsel not ineffective for failing to object to prosecutor's closing argument about witness intimidation where one witness was "obvious[ly]" reluctant to testify against the defendant and two eyewitnesses received phone calls to discourage their cooperation with the police).

(f) *Trial counsel was not ineffective for going beyond the scope of the prosecutor's examination of Detective Demeester, thereby allowing the State to argue evidence related to Blackwell's confession as substantive evidence.*

41

In his defense, Bradford called two witnesses — Brown and an alibi witness. After the defense rested, the trial court allowed the State to recall rebuttal witnesses, including Detective Demeester. Before the detective was called, the court informed the parties that it was going to tell the jury to disregard Detective Demeester's prior testimony concerning Blackwell's custodial statements. The court also instructed the prosecutor that he was precluded from arguing about those custodial statements.

During Detective Demeester's testimony on rebuttal, he first reviewed his interview with Brown, which included details about having reviewed the surveillance video from the Stop and Shop. Detective Demeester also testified about Bradford and his girlfriend having phone calls discussing getting individuals to be quiet and to tell the police that Bradford was home at the time of the murder. On cross-examination, substitute counsel[18] asked Detective Demeester whether he ever obtained any video footage that showed Bradford at

---

[18] Substitute counsel made a limited appearance because trial counsel was apparently experiencing a medical condition at the time.

the Stop and Shop video, and the detective responded that he did not. Counsel then asked whether any witnesses identified Bradford as being at the store, and Detective Demeester said there was none. Counsel then asked whether there were any witnesses, aside from the two other people charged in the case (Tate and Blackwell), who identified Bradford as being present at the store or at the scene of the crime, and Detective Demeester said no.

In closing argument, substitute counsel recounted all the trial witnesses and noted that none of them identified Bradford as a participant in the crime. With respect to Blackwell, substitute counsel argued that some people would do anything to cut a deal, and that Blackwell could not finish his testimony because he "knew it was a lie" and could not send Bradford to prison for something he did not do. Counsel also argued that there was no physical evidence linking Bradford to the crime, that only Tate and Blackwell implicated Bradford, and that Tate and Blackwell could not "follow through" on trying to send Bradford to prison for something he did not do.

Bradford argues that it was unreasonable trial strategy for defense counsel to open the door to testimonial evidence that Blackwell and Tate identified Bradford as a participant in the crime because the trial court had already ruled that it was going to tell the jury to disregard Detective Demeester's testimony about Blackwell's custodial statements. But he has failed to establish that substitute counsel's conduct was deficient.

Bradford has not met his burden to overcome the presumption of reasonableness, because

> [d]ecisions about what questions to ask on cross-examination are quintessential trial strategy and will rarely constitute ineffective assistance of counsel. And decisions as to what evidence to present are ordinarily matters of trial strategy and provide no ground for reversal.

*Ealey v. State*, 322 Ga. 509, 522–23 (2025) (cleaned up). Because substitute counsel elicited testimony that only two people — Blackwell and Tate — had actually identified Bradford as a participant in the crimes, and argued to the jury that it should not consider their statements because they did not provide actual

44

testimony to implicate Bradford, substitute counsel's decision to "open the door" to certain evidence, as Bradford argues, was not patently unreasonable. See *Gomez v. State*, 301 Ga. 445, 459 (2017) (no deficient performance where counsel could reasonably determine that best strategy was to forgo objection to certain testimony and instead use it to challenge the State's theory of the case).

(g) *There was no deficiency in failing to request an accomplice-corroboration charge.*

Bradford argues that because Blackwell was an accomplice witness, the court was required to instruct the jury that his testimony needed to be corroborated, and that trial counsel was deficient for failing to request this instruction. This claim fails.

At the time of Bradford's trial in 2012, "the controlling precedent was that there is no error in declining to give an instruction on accomplice corroboration, even if such a charge is requested, where the accomplice's testimony is in fact corroborated by independent evidence." *Lyman v. State*, 301 Ga. 312, 322 (2017) (quotation marks omitted). That holding was subsequently

45

overruled, but not until after Bradford's trial. See *Robinson v. State*, 303 Ga. 321, 325 (2018) (noting change in law in 2014). Because trial counsel had no duty to anticipate this change in the law, he was not deficient for failing to request an accomplice-corroboration charge. Id.

7. *There is no cumulative prejudice.*

In his last claim, Bradford argues that his convictions should be reversed due to the cumulative prejudice resulting from the trial court's errors and trial counsel's ineffectiveness. This claim fails.

To establish cumulative error, a defendant must demonstrate that "at least two errors were committed in the course of the trial" and "considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied the petitioner a fundamentally fair trial." *State v. Lane*, 308 Ga. 10, 21 (2020) (cleaned up). When considering the "cumulative effect of presumed errors by trial counsel and the trial court," this Court "consider[s] collectively the prejudicial effect, if any, of trial court errors, along with the prejudice caused by any deficient performance

of counsel." *Patterson v. State*, 314 Ga. 167, 181 (2022) (punctuation omitted).

Here, Bradford's claim fails because he has not shown multiple errors, either on the part of the court or trial counsel. We assumed that counsel was ineffective in one instance and concluded that no prejudice resulted from this one assumed deficiency. Because there are no other errors to cumulate, Bradford's cumulative-prejudice claim fails.

*Judgment affirmed. All the Justices concur.*